UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
MAGDALENA KULISZ and SHAHAR KENAN, individuals,
acting in connection with MISS IMMIGRANT USA,
an immigrant civic-identity and public-interest movement,
Plaintiffs,

—against—

THE CITY OF NEW YORK;
JOHN DOE NYPD OFFICERS 1–10,
in their individual and official capacities,
Defendants.
------------------------------------------------------------X

Civil Action No.: __________
JURY TRIAL DEMANDED

# COMPLAINT

(42 U.S.C. § 1983)

## I. JURISDICTION AND VENUE

1. This action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983, and seeks redress for the deprivation of rights secured by the Fourth and Fourteenth Amendments to the United States Constitution.

2. This Court has original subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) because this action presents federal questions and seeks to redress the deprivation, under color of state law, of rights secured by the Constitution and laws of the United States.

3. This Court has authority to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

4. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) and (2) because the events giving rise to the claims occurred within the Southern District of New York and Defendants reside in and conduct business within this District.

## II. PARTIES

5. Plaintiff Magdalena Kulisz is a resident of New York County, New York. At all relevant times, she was a lawful occupant of a private residential apartment located on the Upper East Side of Manhattan.

6. Plaintiff Shahar Kenan is a resident of New York County, New York. At all relevant times, he was a lawful occupant of the same private residential apartment.

7. At all relevant times, Plaintiffs resided in and operated from their residence in connection with Miss Immigrant USA, a civic-identity and public-interest movement. Miss Immigrant USA is referenced solely to describe Plaintiffs' civic and occupational identity and the context of the residence, and is not asserted as a separate plaintiff or legal entity in this action.

8. Defendant City of New York is a municipal corporation organized under the laws of the State of New York. At all relevant times, it was responsible for the policies, practices, training, supervision, and discipline of the New York City Police Department ("NYPD"), and for the actions of NYPD officers acting within the scope of their employment.

9. Defendants John Doe NYPD Officers 1–10 are members of the NYPD whose true names and shield numbers are presently unknown to Plaintiffs. They are sued in their individual capacities for damages and in their official capacities for declaratory and injunctive relief.

**10.** At all relevant times, the John Doe Defendants acted under color of state law and within the scope of their employment. Each participated directly in, or failed to intervene to prevent, the constitutional violations alleged herein.

**11.** Plaintiffs will seek to identify the John Doe Defendants through discovery and amend this Complaint accordingly.

**12.** The identities of John Doe NYPD Officers 1–10 are uniquely within the possession, custody, and control of the City of New York and the NYPD, including through 911/CAD records, dispatch logs, officer assignment rosters, incident reports, and body-worn camera assignment and metadata. Plaintiffs will promptly seek limited discovery to identify these officers and will seek leave to amend this Complaint to substitute their true names and shield numbers and to effect service accordingly.

## III. FACTUAL ALLEGATIONS

13. At all relevant times, Plaintiffs resided in a private apartment that included an adjoining elevated terrace, enclosed by a locked gate, directly attached to the residence, and not open or accessible to the public. The terrace was not a common area and formed part of Plaintiffs' exclusive residential premises and home and home office. The terrace and its gate functioned as a barrier marking the home's private residential boundary.

14. On January 17, 2025, multiple uniformed NYPD officers arrived outside Plaintiffs' residence. The officers did not possess a warrant, court order, consent, or articulated exigent authorization.

15. Initial contact occurred through a terrace-level window door separating the interior of the apartment from the exterior terrace area. Officers positioned themselves near the building entrance and terrace, repeatedly rang the apartment bell, and remained stationed outside while members of the public observed. The terrace door is a glass door, and the terrace-facing windows are glass, allowing officers to see Plaintiffs and visually confirm Plaintiffs' condition without entering the terrace or the residence.

16. After several minutes, Plaintiff Kenan opened the terrace door while remaining within the threshold and asked the officers to identify themselves and state their purpose. An officer stated that a 911 call had been received claiming Plaintiffs were in danger. Plaintiffs immediately stated they were safe and did not know the caller. The officer stated she did not know the caller's identity. Plaintiffs' statements and the visibility through the glass permitted officers to visually confirm that Plaintiffs were okay. The officers temporarily left.

17. Shortly thereafter, officers returned. Plaintiff Kenan again spoke from within the apartment. Officers requested entry and stated they were "looking for somebody." Plaintiffs instructed the officers to leave. The officers refused and asserted they were conducting a "wellness check," stating that no warrant was required. Plaintiffs again denied any emergency, refused consent, and demanded disengagement.

18. Plaintiffs repeatedly demanded that the officers leave and requested a supervisor. Officers refused and remained outside, continuing to ring the bell, observe the residence, and summon additional officers. The officers' conduct escalated after the initial welfare inquiry had already been completed and after Plaintiffs had confirmed they were safe.

19. Plaintiffs expressed fear on video and audio recordings. Plaintiff Kulisz appeared visibly terrified and stated she was scared. Plaintiff Kenan expressed fear and questioned who could protect them.

20. Additional officers arrived and positioned themselves near the terrace, peering through windows and maintaining a prolonged presence. Plaintiffs called 911 seeking assistance from the police presence itself.

21. During the 911 call, Plaintiff Kenan reported that numerous officers were outside without justification, stated that Plaintiffs were scared, and declined to open the door. The operator stated she could not instruct the officers to leave and repeatedly told Plaintiffs to speak with them, despite Plaintiffs' statements that they had already done so and that the officers refused to depart.

22. While officers remained present, the terrace gate was closed, yet one uniformed officer entered the private terrace by jumping over the closed gate and descending the stairs into the terrace area, and a second uniformed officer followed him onto the private terrace. The terrace was directly attached to Plaintiffs' apartment and was not accessible to the public.

23. Plaintiff Kenan immediately objected and stated that the officers had no right to enter. Plaintiff Kulisz, visibly terrified and crying, asked why the officers were doing this and what they wanted. The officer questioned Plaintiff Kulisz's wellbeing despite her repeated statements that she was fine. Because the only separation between Plaintiffs and the officers at that point was the glass terrace door, officers could see Plaintiffs clearly without entry, yet nevertheless advanced into the terrace area.

24. After jumping the closed gate, the officer approached the glass terrace door and behaved aggressively, repeatedly touching, pushing, and pressing against the terrace door in a

manner consistent with an attempt to open the door and gain access to the residence, despite Plaintiffs' express refusal of consent and repeated statements that they were okay.

25. Officers requested that Plaintiff Kulisz come outside to "prove" she was okay. She refused. After further questioning, officers exited the terrace but remained nearby. Plaintiffs reasonably feared imminent forced entry into their home given the officer's physical manipulation of the door and the proximity created by the unlawful terrace intrusion.

26. Multiple officers were present in close proximity and observed the gate-breach and the officer's aggressive manipulation of the glass terrace door, had a realistic opportunity to intervene to stop the unlawful intrusion and de-escalate, and failed to do so.

27. Officers ultimately acknowledged that Plaintiff Kulisz was not being harmed, did not require medical care, and was acting of her own free will. No crime, threat, or emergency was identified. Officers then left.

28. At no point did officers announce a warrant, identify a lawful basis for entry, or articulate exigent circumstances. Officers did not identify any objective indicia of an emergency—such as screams, threats, visible injury, sounds of distress, or corroborated facts—that would justify warrantless entry. Plaintiffs were responsive and visible through the glass, repeatedly denied distress, and officers had less intrusive means available to confirm welfare without breaching gated curtilage or attempting entry at a residential door.

29. Following the encounter, Plaintiffs experienced acute emotional distress. No criminal charges, summonses, or arrests were issued.

30. At all relevant times, Plaintiffs were individuals with documented disabilities.

31. Defendants were on notice, through Plaintiffs' conduct, statements, and visible distress, that Plaintiffs were vulnerable individuals, yet escalated the encounter rather than de-escalating, exacerbating the foreseeable harm.

32. Clearly Established Law. At the time of the events described herein, it was clearly established law that law enforcement officers may not enter a private residence or its curtilage without a warrant, valid consent, or objectively reasonable exigent circumstances. It was further clearly established that generalized welfare or "wellness check" concerns, absent corroborated emergency conditions, do not override the Fourth Amendment's core protection of the home. No reasonable officer could have believed that the conduct alleged herein was lawful under existing constitutional standards. Even if an initial welfare inquiry were permissible, it was clearly established that continued presence, coercive show of authority, and physical entry into residential curtilage after occupants deny distress and refuse consent violates the Fourth Amendment. It was further clearly established that officers may not attempt to force entry through a residential door absent a warrant, valid consent, or objectively reasonable exigent circumstances. Plaintiffs do not challenge an initial knock-and-talk welfare inquiry; they challenge Defendants' refusal to disengage and physical intrusion into gated residential curtilage and attempted door entry after Plaintiffs denied distress and refused consent.

## IV. CLAIMS FOR RELIEF

### COUNT I

Unreasonable Search — Fourth Amendment

*(Against John Doe Officers)*

33. Defendant officers, acting under color of state law, entered and intruded upon Plaintiffs' home and curtilage without a warrant, consent, or exigent circumstances. This unlawful intrusion included entry into Plaintiffs' protected curtilage by jumping a closed gate and advancing to the residence's glass terrace door.

34. The terrace constituted protected curtilage. Plaintiffs expressly denied consent and repeatedly demanded that officers leave. Officers nevertheless physically breached the residential boundary by entering the terrace area despite the closed gate and Plaintiffs' objections.

35. The warrantless entry and surveillance were objectively unreasonable and violated Plaintiffs' clearly established Fourth Amendment rights. After unlawfully entering the curtilage, an officer further escalated by aggressively touching, pushing, and pressing against the glass terrace door in a manner consistent with an attempted warrantless entry into the home itself, despite Plaintiffs' repeated statements that they were safe and their express refusal of consent.

**COUNT II**

Unreasonable Seizure / Show of Authority — Fourth Amendment

*(Against John Doe Officers)*

36. By surrounding Plaintiffs' residence, refusing to leave, repeatedly ringing the bell, summoning additional officers, and asserting authority to remain and enter, Defendants seized Plaintiffs through an overwhelming show of authority. Defendants further escalated this coercive show of authority by breaching Plaintiffs' private residential boundary (jumping the closed terrace gate) and positioning themselves at the residence's glass terrace door.

37. A reasonable person would not have felt free to terminate the encounter. Plaintiffs expressed fear, sought emergency assistance, and were subjected to prolonged coercion. Defendants' actions communicated that Plaintiffs were not free to ignore police or terminate the encounter, and were intended to compel compliance, including by pressuring Plaintiff Kulisz to exit the home to "prove" she was okay.

38. This seizure was unsupported by reasonable suspicion, probable cause, or exigent circumstances. Any initial welfare inquiry was exhausted once Plaintiffs denied distress and officers could visually confirm Plaintiffs' condition through the glass; continued coercion and curtilage intrusion lacked objective emergency justification.

**COUNT III**

Substantive Due Process — Fourteenth Amendment

*(Against John Doe Officers)*

39. This claim is pleaded in the alternative to Plaintiffs' Fourth Amendment claims, and addresses Defendants' arbitrary and oppressive conduct to the extent such conduct is found not to be governed exclusively by the Fourth Amendment.

40. Defendants' conduct was arbitrary, oppressive, and conscience-shocking. Officers exploited a purported "wellness check" to override Plaintiffs' autonomy, privacy, and dignity inside their home, despite repeated confirmations that no danger existed. After initially departing upon Plaintiffs' confirmation of safety, officers returned and escalated to physical intrusion into Plaintiffs' private residential space, including jumping a closed gate and aggressively pressing against the home's glass terrace door, conduct that was disproportionate, punitive, and divorced from any corroborated emergency.

41. The conduct foreseeably caused severe emotional distress and destabilization, particularly given Plaintiffs' vulnerabilities, and violated Plaintiffs' substantive due process rights. Defendants' escalation in the face of visible distress and repeated denials of danger reflects deliberate indifference to Plaintiffs' autonomy and psychological safety in their home.

**COUNT IV**

Municipal Liability (Monell)

*(Against City of New York)*

42. The constitutional violations were caused by the policies, customs, and deliberate indifference of the City of New York.

43. These include, but are not limited to: policies, customs, training deficiencies, and/or operational practices by which NYPD officers conduct "wellness checks" without constitutionally required safeguards; failure to train and supervise officers on Fourth Amendment limits regarding the home and curtilage; failure to require warrants or objectively reasonable exigency for residential entry; and tolerance of prolonged coercive police presence absent lawful authority. This includes training, supervision, and/or operational guidance that permits officers to treat "wellness checks" as warrant-exempt encounters even when occupants deny distress and refuse consent.

44. Upon information and belief, the NYPD maintains written directives, patrol guidance, and training materials governing "wellness checks" and welfare responses, including guidance on entry onto residential property and the limits of warrantless conduct. The uniform assertion here that "no warrant was required" for a wellness check, combined with coordinated escalation to a gated curtilage breach and attempted door entry, plausibly reflects those directives and/or the absence of constitutionally compliant standards.

**45.** Upon information and belief, the escalation involved supervisory direction, acquiescence, or ratification, as reflected by the coordinated re-appearance of officers after the initial welfare inquiry was completed, the refusal to disengage upon demand, and the ensuing entry into gated curtilage and attempted door entry despite repeated denials of distress.

46. This action challenges not an isolated error, but a predictable and recurring constitutional failure arising from the City's lack of clear, constitutionally compliant standards governing wellness checks and residential welfare responses. The need for training and guidance regarding warrantless home and curtilage entry during welfare checks is obvious, and the absence of such safeguards makes constitutional violations highly predictable. In particular, the obvious need for training includes prohibiting officers from breaching gated residential boundaries or attempting to force entry at a residential door absent warrant, consent, or objectively reasonable exigency.

47. The presence of multiple officers, supervisory escalation, refusal to disengage upon demand, and entry into private residential space demonstrate institutional practice, not isolated misconduct. The coordinated escalation culminating in curtilage intrusion and attempted home entry reflects an operational assumption about the scope of lawful "wellness check" authority.

48. The need for training and policy correction was obvious. The City's failure was the moving force behind Plaintiffs' injuries.

49. Anticipation of dismissal. These municipal liability allegations are based on the coordinated conduct of multiple officers, supervisory escalation, refusal to disengage

upon demand, and the standardized invocation of "wellness check" authority, which plausibly reflect an unconstitutional municipal custom or practice and do not depend on discovery to be cognizable at the pleading stage under Monell, Twombly, and Iqbal.

**COUNT V**

Declaratory and Injunctive Relief

*(Against All Defendants)*

50. An actual and ongoing controversy exists because Plaintiffs reside and operate their civic work from the same location, remain subject to future welfare checks or third-party reports, and face a credible risk of repeated warrantless intrusions. Plaintiffs seek narrowly tailored injunctive relief requiring that any residential welfare response comply with the Fourth Amendment—warrant, valid consent, or objectively reasonable exigency—before entry into gated curtilage or attempts to enter through a residential door.

51. Plaintiffs seek declaratory relief that Defendants' conduct violated the Constitution and injunctive relief barring similar practices absent lawful process. Plaintiffs further seek an injunction prohibiting officers from entering gated residential curtilage or attempting to force entry at a residential door under the label of a "wellness check" absent the constitutionally required conditions.

52. Plaintiffs bring this action individually and in connection with their civic-identity work through Miss Immigrant USA, which operates from the residence and is directly impacted by police interference and public stigma.

**V. RESERVATION OF RIGHTS**

53. Plaintiffs expressly reserve the right to amend or supplement this Complaint as additional facts are learned through discovery and upon the retention of counsel, including the right to seek class-wide relief on behalf of similarly situated individuals to the extent permitted by law.
54. Plaintiffs assert no state-law claims in this action at this time.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

a. Declare that Defendants' conduct violated Plaintiffs' constitutional rights;
b. Enter injunctive relief prohibiting warrantless residential intrusions absent lawful process;
c. Award compensatory damages to Plaintiffs;
d. Award punitive damages against the individual Defendants;
e. Award costs and attorneys' fees pursuant to 42 U.S.C. § 1988; and
f. Grant such other and further relief as the Court deems just and proper.

Date: January 28, 2026
New York, NY

/s/ Magdalena Kulisz
/s/ Shahar Kenan
209 East 83rd Street
New York, NY 10028
missimmigrantusa@gmail.com.