UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

————————————————————————X

MAGDALENA KULISZ and SHAHAR KENAN,
     Plaintiffs,

-against-

THE CITY OF NEW YORK;
POLICE OFFICER RUBENIA CANAS, Tax Registry No. 976507;
POLICE OFFICER ANTHONY MEHALE, Tax Registry No. 974342;
POLICE OFFICER TIFFANY MORAN, Tax Registry No. 975040; and
LIEUTENANT ALEXANDER AVDIC, Tax Registry No. 950033,
in their individual capacities,
     Defendants.

————————————————————————X

**Case No. 1:26-cv-00981-JLR**

# FIRST AMENDED COMPLAINT
## PURSUANT TO THE COURT'S VALENTINE ORDER
## 42 U.S.C. § 1983

JURY TRIAL DEMANDED

Plaintiffs Magdalena Kulisz and Shahar Kenan, appearing pro se, respectfully allege as follows:

## I. INTRODUCTORY NOTE REGARDING AMENDMENT

1.     Plaintiffs file this First Amended Complaint after Defendant City of New York identified Police Officer Rubenia Canas, Police Officer Anthony Mehale, Police Officer Tiffany Moran, and Lieutenant Alexander Avdic in response to the Court's Valentin Order.

2.     Plaintiffs name these individuals based on the City's identification of officers who may have been involved in the incident alleged in the original Complaint. Plaintiffs do not adopt any

1

defense characterization concerning the lawfulness, completeness, purpose, or scope of the police conduct described herein.

3. This First Amended Complaint arises from the same January 17, 2025 incident alleged in the original Complaint and is intended to substitute the identified officers for the previously unidentified John Doe defendants, plead conforming allegations regarding personal involvement and failure to intervene, and preserve Plaintiffs' claims against the City of New York. Plaintiffs do not assert new unrelated events, unrelated parties, or state-law claims in this First Amended Complaint.

4. Plaintiffs have not yet received full discovery, including complete body-worn camera footage, 911/CAD records, dispatch records, memo book entries, assignment records, supervisor records, internal communications, and other materials within Defendants' possession. Plaintiffs therefore plead certain allegations against the individual officer Defendants upon information and belief and reserve the right to further amend if discovery reveals additional facts, additional participants, or more precise individual roles.


## II. JURISDICTION AND VENUE

5. This action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983, and seeks redress for the deprivation of rights secured by the Fourth and Fourteenth Amendments to the United States Constitution.

6. This Court has original subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) because this action presents federal questions and seeks to redress the deprivation, under color of state law, of rights secured by the Constitution and laws of the United States.

7. This Court has authority to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

8. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) and (2) because the events giving rise to the claims occurred within the Southern District of New York and Defendants reside in, work in, conduct business in, or are employed by a municipal entity located

within this District.

### III. PARTIES

9.      Plaintiff Magdalena Kulisz is an individual currently displaced within New York City. At the time of the events alleged herein, she was a lawful occupant of a private residential apartment located on the Upper East Side of Manhattan, New York County, New York.

10.     Plaintiff Shahar Kenan is an individual currently displaced within New York City. At the time of the events alleged herein, he was a lawful occupant of the same private residential apartment located on the Upper East Side of Manhattan, New York County, New York.

11.     At the time of the events alleged herein, Plaintiffs resided in and operated from their residence in connection with Miss Immigrant USA, a civic-identity and public-interest movement. Miss Immigrant USA is referenced solely to describe Plaintiffs' civic and occupational identity, the public-facing context of Plaintiffs' residence and home office, and the broader harm to Plaintiffs' dignity, safety, reputation, and civic work. Miss Immigrant USA is not asserted as a separate plaintiff, separate legal entity, or organization represented by Plaintiffs in this action. Plaintiffs appear only on their own behalf as natural persons proceeding pro se.

12.     Defendant City of New York is a municipal corporation organized under the laws of the State of New York. At all relevant times, it was responsible for the policies, practices, training, supervision, and discipline of the New York City Police Department, including policies and practices governing residential welfare checks, officer entry onto private residential property, warrantless entry, use of coercive police presence, supervision, and officer compliance with the Fourth Amendment.

13.     Defendant Police Officer Rubenia Canas, Tax Registry No. 976507, was at all relevant times a New York City Police Department officer acting under color of state law. Upon information and belief, Defendant Canas was assigned to the 19th Precinct and may be served at 153 East 67th Street, New York, New York 10065. Defendant Canas is sued in her individual capacity for damages.

14.     Defendant Police Officer Anthony Mehale, Tax Registry No. 974342, was at all relevant times a New York City Police Department officer acting under color of state law. Upon information and belief, Defendant Mehale was assigned to the 19th Precinct and may be served at 153 East 67th Street, New York, New York 10065. Defendant Mehale is sued in his individual capacity for damages.

15.     Defendant Police Officer Tiffany Moran, Tax Registry No. 975040, was at all relevant times a New York City Police Department officer acting under color of state law. Upon information and belief, Defendant Moran was assigned to the 19th Precinct and may be served at 153 East 67th Street, New York, New York 10065. Defendant Moran is sued in her individual capacity for damages.

16.     Defendant Lieutenant Alexander Avdic, Tax Registry No. 950033, was at all relevant times a New York City Police Department lieutenant acting under color of state law. Upon information and belief, Defendant Avdic was assigned to the 108th Precinct and may be served at 5-47 50th Avenue, Long Island City, New York 11101. Defendant Avdic is sued in his individual capacity for damages.

17.     At all relevant times, Defendants Canas, Mehale, Moran, and Avdic acted under color of state law and within the scope of their employment as NYPD personnel. Each was personally involved in the events alleged herein by direct participation, presence and assistance, supervisory direction or acquiescence, failure to intervene, failure to de-escalate, or failure to prevent unconstitutional conduct after having a realistic opportunity to do so.

18.     Because body-worn camera footage, 911/CAD records, dispatch logs, radio communications, memo book entries, assignment records, and supervisory records are within the possession, custody, and control of Defendants, Plaintiffs plead individual conduct based on the information presently available and upon information and belief where the precise officer-by-officer allocation of conduct cannot yet be fully known without discovery.

## IV. FACTUAL ALLEGATIONS

19.     At all relevant times, Plaintiffs resided in a private apartment that included an adjoining elevated terrace, enclosed by a locked or closed gate, directly attached to the residence, and not open or accessible to the public.

20.     The terrace was not a public area and was not a common area open to strangers. It formed part of Plaintiffs' exclusive residential premises, home, and home office. The terrace and its gate functioned as a physical and visible barrier marking the home's private residential boundary.

21.     On January 17, 2025, multiple uniformed NYPD officers arrived outside Plaintiffs' residence. The officers did not possess a warrant, court order, consent, or articulated exigent authorization.

22.     Upon information and belief, Defendants Canas, Mehale, Moran, and Avdic were among the officers who responded to, participated in, supervised, remained present during, or failed to intervene in the police encounter alleged herein.

23.     Initial contact occurred through a terrace-level glass door separating the interior of the apartment from the exterior terrace area. Officers positioned themselves near the building entrance and terrace, repeatedly rang the apartment bell, and remained stationed outside while members of the public observed.

24.     The terrace door and terrace-facing windows were glass, allowing officers to see Plaintiffs and visually confirm Plaintiffs' condition without entering the terrace or residence.

25.     After several minutes, Plaintiff Kenan opened the terrace door while remaining within the threshold and asked the officers to identify themselves and state their purpose. An officer stated that a 911 call had been received claiming Plaintiffs were in danger.

26.     Plaintiffs immediately stated that they were safe and did not know the caller. The officer stated that she did not know the caller's identity. Plaintiffs' statements, appearance, and visibility through the glass permitted officers to visually confirm that Plaintiffs were alive, responsive, and not in observable physical danger.

27.     After the initial welfare inquiry, the officers temporarily left.

28.     Shortly thereafter, officers returned. Plaintiff Kenan again spoke from within the apartment. Officers requested entry and stated that they were "looking for somebody."

29.     Plaintiffs instructed the officers to leave. Officers refused and asserted that they were conducting a "wellness check," stating in substance that no warrant was required.

30.     Plaintiffs again denied any emergency, refused consent, and demanded that the officers disengage and leave the private residential area.

31.     Plaintiffs repeatedly demanded that the officers leave and requested a supervisor. Officers refused and remained outside, continuing to ring the bell, observe the residence, and summon or coordinate with additional officers.

32.     The officers' conduct escalated after the initial welfare inquiry had already been completed and after Plaintiffs had confirmed they were safe, visible, responsive, and not requesting police assistance.

33.     Plaintiffs expressed fear on video and audio recordings. Plaintiff Kulisz appeared visibly terrified and stated that she was scared. Plaintiff Kenan expressed fear and questioned who could protect them from the police presence itself.

34.     Additional officers arrived and positioned themselves near the terrace, peering through windows and maintaining a prolonged presence. Plaintiffs called 911 seeking assistance from the police presence itself.

35.     During the 911 call, Plaintiff Kenan reported that numerous officers were outside without justification, stated that Plaintiffs were scared, and declined to open the door. The operator stated that she could not instruct the officers to leave and repeatedly told Plaintiffs to speak with them, despite Plaintiffs' statements that they had already done so and that the officers refused to depart.

36.     While officers remained present, the terrace gate was closed, yet one uniformed officer entered the private terrace by jumping over the closed gate and descending the stairs into the terrace area, and a second uniformed officer followed him onto the private terrace.

37.    Upon information and belief, one or more of Defendants Canas, Mehale, Moran, and Avdic directly participated in, assisted, supervised, observed, or failed to intervene to prevent the entry into Plaintiffs' gated private terrace.

38.    The terrace was directly attached to Plaintiffs' apartment and was not accessible to the public. Plaintiffs did not consent to the entry.

39.    Plaintiff Kenan immediately objected and stated that the officers had no right to enter.

40.    Plaintiff Kulisz, visibly terrified and crying, asked why the officers were doing this and what they wanted.

41.    An officer questioned Plaintiff Kulisz's wellbeing despite her repeated statements that she was fine. Because the only separation between Plaintiffs and the officers at that point was the glass terrace door, officers could see Plaintiffs clearly without entering the terrace.

42.    After jumping or entering through the closed terrace boundary, an officer approached the glass terrace door and behaved aggressively, repeatedly touching, pushing, pressing, or manipulating the terrace door in a manner consistent with an attempt to open the door or gain access to the residence.

43.    This occurred despite Plaintiffs' express refusal of consent and repeated statements that they were okay.

44.    Upon information and belief, one or more of Defendants Canas, Mehale, Moran, and Avdic directly participated in, assisted, supervised, observed, or failed to intervene to prevent the officer's aggressive manipulation of the glass terrace door.

45.    Officers requested that Plaintiff Kulisz come outside to "prove" she was okay. She refused.

46.    After further questioning, officers exited the terrace but remained nearby. Plaintiffs reasonably feared imminent forced entry into their home given the officer's physical manipulation of the door, the number of officers present, and the proximity created by the unlawful terrace intrusion.

47.     Multiple officers were present in close proximity and observed the gate-breach, the officer's entry into the private terrace, and the officer's physical manipulation of the glass terrace door.

48.     The officers who did not personally jump the gate or manipulate the door had a realistic opportunity to intervene, instruct the offending officer to stop, de-escalate the encounter, direct officers to leave, or prevent further intrusion. They failed to do so.

49.     Upon information and belief, Defendant Lieutenant Avdic, by rank and role, participated in, supervised, acquiesced in, ratified, or failed to stop the escalation, including the prolonged police presence, refusal to disengage, entry into Plaintiffs' gated residential terrace, and coercive pressure upon Plaintiffs to comply.

50.     Officers ultimately acknowledged that Plaintiff Kulisz was not being harmed, did not require medical care, and was acting of her own free will.

51.     No crime, threat, or emergency was identified. Officers then left.

52.     At no point did officers announce a warrant, identify a lawful basis for entry, or articulate objective exigent circumstances.

53.     Officers did not identify any objective indicia of an emergency, such as screams, threats, visible injury, sounds of distress, violence, medical collapse, corroborated emergency facts, or any observation that would justify warrantless entry into Plaintiffs' private residential curtilage.

54.     Plaintiffs were responsive and visible through the glass, repeatedly denied distress, and officers had less intrusive means available to confirm welfare without breaching gated curtilage or attempting entry at a residential door.

55.     Following the encounter, Plaintiffs experienced acute emotional distress, fear, anxiety, humiliation, destabilization, and loss of safety inside their own home.

56.     No criminal charges, summonses, or arrests were issued.

57.     At all relevant times, Plaintiffs were individuals with documented disabilities and disability-related vulnerabilities.

58.    Defendants were on notice, through Plaintiffs' conduct, statements, visible distress, and repeated requests that the officers leave, that Plaintiffs were vulnerable and frightened individuals.

59.    Instead of de-escalating, Defendants escalated the encounter, exacerbating the foreseeable harm.

60.    At the time of the events described herein, it was clearly established law that law enforcement officers may not enter a private residence or its curtilage without a warrant, valid consent, or objectively reasonable exigent circumstances.

61.    It was further clearly established that generalized welfare or "wellness check" concerns, absent corroborated emergency conditions, do not override the Fourth Amendment's core protection of the home.

62.    No reasonable officer could have believed that the conduct alleged herein was lawful under existing constitutional standards.

63.    Even if an initial welfare inquiry were permissible, it was clearly established that continued presence, coercive show of authority, and physical entry into residential curtilage after occupants deny distress and refuse consent violates the Fourth Amendment.

64.    It was further clearly established that officers may not attempt to force entry through a residential door absent a warrant, valid consent, or objectively reasonable exigent circumstances.

65.    Plaintiffs do not challenge a brief, lawful knock-and-talk welfare inquiry. Plaintiffs challenge Defendants' refusal to disengage, coercive escalation, physical intrusion into gated residential curtilage, and attempted or threatened door entry after Plaintiffs denied distress, refused consent, and could be visually observed through glass.


**V. CLAIMS FOR RELIEF**

COUNT I
 Unreasonable Search — Fourth Amendment
**Against Defendants Canas, Mehale, Moran, and Avdic, in their individual capacities**

9

66.     Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

67.     Defendants Canas, Mehale, Moran, and Avdic, acting under color of state law, entered, participated in entering, assisted, supervised, acquiesced in, or failed to intervene to prevent entry into Plaintiffs' home and curtilage without a warrant, consent, or exigent circumstances.

68.     The unlawful intrusion included entry into Plaintiffs' protected curtilage by jumping or crossing a closed gated residential boundary and advancing to the residence's glass terrace door.

69.     The terrace constituted protected curtilage because it was directly attached to Plaintiffs' home, enclosed by a gate, associated with the intimate activities of the home, and not open to the public.

70.     Plaintiffs expressly denied consent and repeatedly demanded that officers leave.

71.     Despite Plaintiffs' objections, one or more individual Defendants physically breached the residential boundary by entering the terrace area, while other individual Defendants participated, assisted, supervised, acquiesced, or failed to intervene.

72.     The warrantless entry and surveillance were objectively unreasonable and violated Plaintiffs' clearly established Fourth Amendment rights.

73.     After the curtilage intrusion, one or more officers further escalated by aggressively touching, pushing, pressing, or manipulating the glass terrace door in a manner consistent with an attempted warrantless entry into the home itself, despite Plaintiffs' repeated statements that they were safe and their express refusal of consent.

**COUNT II**
 Unreasonable Seizure / Coercive Show of Authority — Fourth Amendment
**Against Defendants Canas, Mehale, Moran, and Avdic, in their individual capacities**

74.     Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

75.     By surrounding Plaintiffs' residence, refusing to leave, repeatedly ringing the bell, summoning or coordinating additional officers, asserting authority to remain and enter, breaching

the closed gated terrace boundary, and pressuring Plaintiff Kulisz to exit the home to "prove" she was okay, Defendants seized Plaintiffs through an overwhelming and coercive show of authority.

76.    A reasonable person in Plaintiffs' position would not have felt free to terminate the encounter, ignore the police presence, or refuse compliance without risking escalation or forced entry.

77.    Plaintiffs expressed fear, sought emergency assistance, and were subjected to prolonged coercion.

78.    Defendants' actions communicated that Plaintiffs were not free to ignore police or terminate the encounter, and were intended to compel compliance.

79.    This seizure was unsupported by reasonable suspicion, probable cause, or exigent circumstances.

80.    Any initial welfare inquiry was exhausted once Plaintiffs denied distress, were visible through the glass, and officers could visually confirm Plaintiffs' condition.

81.    Continued coercion, refusal to disengage, curtilage intrusion, and pressure to open or exit the home lacked objective emergency justification and violated Plaintiffs' clearly established Fourth Amendment rights.

**COUNT III**

 Failure to Intervene

**Against Defendants Canas, Mehale, Moran, and Avdic, in their individual capacities**

82.    Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

83.    Law enforcement officers have an affirmative duty to intervene to prevent constitutional violations committed by fellow officers when they observe, or have reason to know, that a constitutional violation is occurring and have a realistic opportunity to intervene.

84.    Defendants Canas, Mehale, Moran, and Avdic were present for, participated in, observed, supervised, or had reason to know of the prolonged police presence, refusal to disengage,

11

warrantless entry into Plaintiffs' gated residential terrace, and aggressive manipulation of the glass terrace door.

85.     The officers who did not personally enter the terrace or manipulate the door had sufficient time and opportunity to intervene, de-escalate, instruct other officers to stop, direct withdrawal from the private terrace, or prevent further unconstitutional conduct.

86.     They failed to do so.

87.     Defendant Lieutenant Avdic, as a lieutenant and supervisory officer, had heightened practical authority and opportunity to direct officers to disengage, stop the curtilage intrusion, prevent further escalation, or ensure compliance with the Fourth Amendment.

88.     The failure to intervene caused and prolonged Plaintiffs' constitutional injuries, fear, humiliation, emotional distress, and loss of security in their home.


**COUNT IV**

Substantive Due Process — Fourteenth Amendment

**Against Defendants Canas, Mehale, Moran, and Avdic, in their individual capacities**

89.     Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

90.     This claim is pleaded in the alternative to Plaintiffs' Fourth Amendment claims and addresses Defendants' arbitrary and oppressive conduct to the extent such conduct is found not to be governed exclusively by the Fourth Amendment.

91.     Defendants' conduct was arbitrary, oppressive, and conscience-shocking.

92.     Officers exploited a purported "wellness check" to override Plaintiffs' autonomy, privacy, dignity, and safety inside their home, despite repeated confirmations that no danger existed.

93.     After initially receiving confirmation that Plaintiffs were safe, officers escalated to a prolonged coercive presence, repeated demands, entry into Plaintiffs' private gated residential space, and aggressive manipulation of the residence's glass terrace door.

12

94.    Defendants' conduct was disproportionate, punitive, and divorced from any corroborated emergency.

95.    The conduct foreseeably caused severe emotional distress and destabilization, particularly given Plaintiffs' vulnerabilities, and violated Plaintiffs' substantive due process rights.

96.    Defendants' escalation in the face of visible distress and repeated denials of danger reflected deliberate indifference to Plaintiffs' autonomy, dignity, psychological safety, and right to be secure in their home.


**COUNT V**

Municipal Liability — Monell

**Against Defendant City of New York**

97.    Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

98.    The constitutional violations were caused by the policies, customs, practices, training deficiencies, supervision failures, and deliberate indifference of Defendant City of New York.

99.    These include, but are not limited to, policies, customs, training deficiencies, and operational practices by which NYPD officers conduct "wellness checks" without constitutionally required safeguards.

100.    The City failed to train and supervise officers on Fourth Amendment limits regarding the home and curtilage, including the prohibition against warrantless entry into gated residential areas absent a warrant, valid consent, or objectively reasonable exigent circumstances.

101.    The City failed to require warrants, valid consent, or objectively reasonable exigency before officers enter protected residential curtilage or attempt entry into a private home during welfare-check responses.

102.    The City tolerated prolonged coercive police presence absent lawful authority, including after occupants deny distress, refuse consent, and can be visually confirmed through less intrusive means.

13

103.    The City maintained or tolerated training, supervision, and operational guidance that permitted officers to treat "wellness checks" as warrant-exempt encounters even when occupants deny distress and refuse consent.

104.    Upon information and belief, the NYPD maintains written directives, patrol guidance, and training materials governing wellness checks and welfare responses, including guidance on entry onto residential property and the limits of warrantless conduct.

105.    The uniform assertion that "no warrant was required" for a wellness check, combined with coordinated escalation to a gated curtilage breach and attempted or threatened door entry, plausibly reflects those directives, training failures, supervision failures, and/or the absence of constitutionally compliant standards.

106.    Upon information and belief, the escalation involved supervisory direction, acquiescence, ratification, or failure to intervene, as reflected by the coordinated reappearance of officers after the initial welfare inquiry was completed, the refusal to disengage upon demand, and the entry into gated curtilage despite repeated denials of distress.

107.    This action challenges not an isolated error, but a predictable constitutional failure arising from the City's lack of clear, constitutionally compliant standards governing wellness checks and residential welfare responses.

108.    The need for training and guidance regarding warrantless home and curtilage entry during welfare checks is obvious, and the absence of such safeguards makes constitutional violations highly predictable.

109.    In particular, the obvious need for training includes prohibiting officers from breaching gated residential boundaries or attempting to force entry at a residential door absent warrant, valid consent, or objectively reasonable exigency.

110.    The presence of multiple officers, supervisory escalation, refusal to disengage upon demand, and entry into private residential space demonstrate institutional practice, not isolated misconduct.

111.    The coordinated escalation culminating in curtilage intrusion and attempted or threatened home entry reflects an operational assumption about the scope of lawful "wellness check" authority.

112.    The City's failure to train, supervise, discipline, and correct these practices was the moving force behind Plaintiffs' injuries.

113.    These municipal liability allegations are based on coordinated conduct, supervisory escalation, refusal to disengage upon demand, and the standardized invocation of "wellness check" authority, which plausibly reflect an unconstitutional municipal custom, practice, policy, or deliberate-indifference failure.

**COUNT VI**

Declaratory and Injunctive Relief

**Against Defendant City of New York and, to the extent legally applicable, all Defendants**

114.    Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

115.    An actual and ongoing controversy exists because Plaintiffs remain subject to future welfare checks, third-party reports, and similar police responses, and face a credible risk of repeated warrantless intrusion, coercive escalation, and stigma.

116.    Plaintiffs seek narrowly tailored declaratory and injunctive relief requiring that any residential welfare response comply with the Fourth Amendment before officers enter gated residential curtilage or attempt to enter through a residential door.

117.    Plaintiffs seek declaratory relief that Defendants' conduct violated the Constitution.

118.    Plaintiffs seek injunctive relief barring similar practices absent lawful process, valid consent, or objectively reasonable exigent circumstances.

119.    Plaintiffs further seek an injunction prohibiting officers from entering gated residential curtilage or attempting to force or pressure entry at a residential door under the label of a "wellness check" absent the constitutionally required conditions.

15

120.    Plaintiffs bring this action only on their own behalf as natural persons. Plaintiffs' connection to Miss Immigrant USA is pleaded solely as factual context for Plaintiffs' home-based civic work, reputational harm, fear, disruption, and damages.

## VI. RESERVATION OF RIGHTS

121.    Plaintiffs expressly reserve the right to amend or supplement this Complaint as additional facts are learned through discovery, including body-worn camera footage, 911/CAD records, dispatch records, officer assignment records, memo book entries, supervisor records, internal communications, and any documents identifying additional participants or clarifying each named Defendant's specific role.

122.    Plaintiffs further reserve the right to seek leave to amend upon the retention of counsel, upon production of records, or upon discovery of additional facts.

123.    Plaintiffs assert no state-law claims in this action at this time.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

a. Declare that Defendants' conduct violated Plaintiffs' constitutional rights;

b. Enter injunctive relief prohibiting warrantless residential intrusions and warrantless entry into gated residential curtilage absent lawful process, valid consent, or objectively reasonable exigent circumstances;

c. Award compensatory damages to Plaintiffs;

d. Award punitive damages against the individual Defendants;

e. Award costs and attorneys' fees to the extent authorized by law, including 42 U.S.C. § 1988, if applicable;

f. Direct service of the First Amended Complaint upon the newly named individual Defendants through appropriate procedures available to Plaintiffs proceeding in forma pauperis; and

g. Grant such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury on all issues so triable.

Dated: June 14, 2026
New York

Respectfully submitted,

/s/ Magdalena Kulisz
 MAGDALENA KULISZ
 Plaintiff Pro Se

/s/ Shahar Kenan
 SHAHAR KENAN
 Plaintiff Pro Se

Email: missimmigrantusa@gmail.com
Telephone: Not in service
Plaintiffs are currently displaced within New York City and do not presently have a stable mailing address.

17